1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| GARRAPATA, LLC,<br><br>              Plaintiff,<br><br>       v.<br><br>NOROK INNOVATION, INC.; ERIC POPOWICZ; THUNDERCOM SYSTEMS LTD; COLIN ANDREWS aka SIMON THUNDERCOM; BIZX MARKETING, LLC; AZ CONNECTIONS, LLC; JEFF TAYLOR; and DOES 1-30, inclusive,<br><br>              Defendant. | Case No.: CV 21-00356-CJC (PDx)<br><br>**ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT [Dkt. 71] AND DENYING PLAINTIFF'S APPLICATION TO SEAL [Dkt. 69]** |

## I.    INTRODUCTION & BACKGROUND

Plaintiff Garrapata, LLC alleges claims for misappropriation of name and likeness (Cal. Civ. Code § 3344), the common law right of publicity, false endorsement under the Lanham Act (15 U.S.C. § 1125(a)), trademark infringement (15 U.S.C. § 1114(1)(A)),

and common law trademark infringement against the only remaining Defendants in this action, Norok Innovation, Inc. ("Norok") and Eric Popowicz ("Popowicz") (collectively "Defendants").  (Dkt. 1 [Complaint].)  Plaintiff alleges that Defendants are responsible for "an online Internet scam that illegally uses [Clint] Eastwood's celebrity and name to drive traffic to an online marketplace selling cannabidiol ("CBD") products and to promote CBD products thereon."  (*Id.* ¶ 2.)  Plaintiff owns the rights of publicity in Mr. Eastwood's name, image, likeness, and persona for all purposes, other than those related to the promotion and exploitation of the motion pictures Mr. Eastwood makes.  (Compl. ¶ 5, Dkt. 71-2 [Declaration of Clint Eastwood, hereinafter "Eastwood Decl."] ¶ 2–3; Dkt. 71-3 [Declaration of Howard Bernstein, hereinafter "Bernstein Decl."] ¶¶ 2–3.)  Plaintiff also owns a federally registered trademark, U.S. Registration No. 3265483, in Mr. Eastwood's name for "Entertainment services, namely, personal appearances and live performance and live recorded performances by a movie star and actor" (the "Registered Mark").  (Compl. ¶ 65, Ex. 3; Bernstein Decl. ¶ 4, Exhibit 1 [Plaintiff's Trademark Certificate from the United States Patent and Trademark Office].)

Plaintiff filed this action on January 14, 2021.  (Compl.)  On January 21, 2021, the complaint and summons were personally served on Norok.  (Dkt. 15.)  The Clerk entered Norok's default on February 17, 2021.  (Dkt. 27.)  On August 6, 13, 20, and 27 of 2021, the complaint and summons were served on Popowicz via publication, (Dkt. 51), with the Court's approval, (Dkt. 48).  The clerk entered Popowicz's default on September 21, 2021.  (Dkt. 53.)  To date, neither Defendant has appeared in the case.  Before the Court is Plaintiff's motion for default judgment against Defendants.  (Dkt. 71 [Motion for Default Judgment, hereinafter "Mot."].)  For the following reasons, Plaintiff's motion is **GRANTED IN SUBSTANTIAL PART**.[1]

---

[1]  Having read and considered the papers presented by the parties, the Court finds this matter appropriate for disposition without a hearing.  *See* Fed. R. Civ. P. 78; Local Rule 7-15.  Accordingly, the hearing set for May 16, 2022, at 1:30 p.m. is hereby vacated and off calendar.

## II.   LEGAL STANDARD & ANALYSIS

In determining whether granting default judgment is appropriate, the Court examines (1) its jurisdiction, (2) whether Plaintiff has met the procedural requirements for default judgment, (3) the merits of Plaintiff's motion for default judgment, and (4) whether it is appropriate to grant the relief Plaintiff seeks.

### A.   Jurisdiction and Service of Process

In considering whether to enter default judgment against a defendant, a court must first determine whether it has jurisdiction over the subject matter and the parties.  *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

### 1.  Subject Matter Jurisdiction

Here, the Court has federal question jurisdiction over Plaintiff's federal trademark infringement claims, and supplemental jurisdiction over Plaintiff's state law claims since they form part of the same case or controversy as the federal claims.   *See* 28 U.S.C. §§1331, 1367(a), 1338(a); 15 U.S.C. §§ 1041 *et seq*.; 15 U.S.C. § 1114(a)(A).

### 2.  Personal Jurisdiction

The Court also has personal jurisdiction over Defendants.  "As the party seeking to invoke this Court's jurisdiction, Plaintiff bears the burden of establishing that this Court has personal jurisdiction over Defendants." *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1052 (N.D. Cal. 2010) (citing *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986)).  "In the context of a motion for default judgment, the Court may dismiss an

action *sua sponte* for lack of personal jurisdiction . . . however, a court should allow the plaintiff the opportunity to establish that jurisdiction is proper." *Id.*

Plaintiff maintains that the Court possesses specific personal jurisdiction over each Defendant because they "purposefully directed their activities and consummated transactions in California in carrying out their illegal scheme and because their scheme is inflicting harm on businesses and consumers in California." (Mot. at 4; Compl. ¶ 15.) Plaintiff also alleges that Norok is a Florida corporation with its principal place of business in Los Angeles, California. (Compl. ¶ 6.) Accordingly, the Court has general personal jurisdiction over Norok. *Daimler AG v. Bauman*, 571 U.S. 117, 134 (2014) ("With respect to a corporation, the place of incorporation and principal place of business are paradig[m] . . . bases for general jurisdiction.") (internal citation omitted). Plaintiff also alleges that Popowicz is an individual and resident of Los Angeles County, California. Accordingly, the Court may also exercise general personal jurisdiction over Popowicz. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 (1985).

**B. Service of Process**

Courts must also determine whether there was sufficient service of process on the party against whom default judgment is requested. *See Mason v. Genisco Tech. Corp.*, 960 F.2d 849, 851 (9th Cir. 1992). Here, there has been adequate service of process on each Defendant pursuant to Federal Rule of Civil Procedure 4 because each Defendant was served in compliance with California law. (*See* Dkt. 15 [Proof of Service Upon Defendant Norok Innovation, Inc.]; Dkt. 49 [Order Granting Plaintiff's Motion for Service by Publication Upon Defendant Eric Popowicz]; Dkt. 51 [Proof of Service Upon Defendant Eric Popowicz].)

### C.    Procedural Requirements for Default Judgment

Federal Rule of Civil Procedure 55(b)(2) and Central District of California Local Rule 55-1 also require that applications for default judgment set forth the following information: "(1) when and against which party default was entered; (2) the identification of the pleadings to which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether the person is adequately represented; (4) that the Soldiers' and Sailors' Civil Relief Act of 1940 does not apply; and (5) that notice of the application has been served on the defaulting party, if required." *Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003).  Those requirements have been satisfied here.  First, the clerk entered default against Norok on February 17, 2021, (Dkt. 27), and against Popowicz on September 21, 2021, (Dkt. 53).  Second, default was entered as to the Complaint.  (*See* Dkts. 27, 53.)  Third, Defendants are not infants nor incompetent persons, (Dkt. 71-5 [Declaration of Jordan Susman in Support of Plaintiff's Motion for Default Judgment, hereinafter "Susman Decl."] ¶ 14).  Fourth, the Soldiers' and Sailors' Relief Act of 1940 does not apply, (*id.*).  The fifth requirement, notice of the application, does not apply because Defendants failed to appear in this action.  Fed. R. Civ. P. 55(b)(2).

### D.    Merits of the Motion for Default Judgment

After entry of default, a court may grant a default judgment on the merits of the case.  Fed. R. Civ. P. 55(a)–(b).  "The district court's decision whether to enter a default judgment is a discretionary one."  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).  In exercising their discretion, courts consider the following factors articulated in *Eitel v. McCool*, 782 F.2d 1470, (9th Cir. 1986):

(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money

at stake in the action, (5) the possibility of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Id.* at 1471–72.  Because default has been entered in this case, the Court accepts as true all of "the factual allegations of the complaint, except those relating to the amount of damages." *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). Here, the *Eitel* factors weigh in favor of a default judgment.

### 1.  Possibility of Prejudice to Plaintiff

The first *Eitel* factor requires the Court to consider the harm to the plaintiff if the Court does not grant default judgment.  *See PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002).  This factor weighs in Plaintiff's favor because without a default judgment it would lack any other recourse for recovery against Defendants since Defendants failed to appear or to defend this suit.  *See Seiko Epson Corp. v. Prinko Image Co. (USA)*, 2018 WL 6264988, at *2 (C.D. Cal. Aug. 22, 2018) ("Given Defendant's unwillingness to answer and defend, denying default judgment would render Plaintiffs without recourse.").

### 2. & 3.  The Merits of the Claim and the Sufficiency of the Complaint

Even where default is entered, courts must still determine whether the facts alleged give rise to a cognizable cause of action because "claims [that] are legally insufficient . . . are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).  Accordingly, the second and third *Eitel* factors, taken together, "require that a plaintiff state a claim on which [the plaintiff] may recover." *Philip Morris USA,*

*Inc. v. Castworld Prod., Inc.*, 219 F.R.D. 494, 499 (C.D. Cal. 2003).  Plaintiff has alleged several claims against Defendants.  Th Court takes each in turn.

### a.  Common Law Right of Publicity

To recover on a common law right of publicity claim, or a misappropriation of name or likeness claim, Plaintiff must prove "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury."  *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1138 (9th Cir. 2006).  Plaintiff has established these elements.

With respect to the first two elements, Plaintiff alleges that Defendants have used an aspect of Mr. Eastwood's identity, *i.e.*, his name, to Defendants' commercial advantage.  Specifically, Plaintiff alleges that Defendants use Mr. Eastwood's name in hidden metatags so that an online internet search for the terms "Clint Eastwood CBD" leads consumers to a website entitled "online-cbd-shop.com."  (Compl. ¶ 23; Dkt. 1-1 [Exhibit 1, Screenshot of Google Search Results for Terms "Clint Eastwood CBD"]; Susman Decl. ¶ 2.)  Clicking on the link for online-cbd-shop.com takes the consumer to a marketplace selling "61 PRODUCTS FOUND FOR 'CLINT EASTWOOD CBD PRODUCTS.'"  (*Id.* ¶ 24, Dkt. 1-2 [Exhibit 2, Screenshot of Search Results on Online-cbd-shop.com]; Susman Decl. ¶ 3.)  Plaintiff alleges that by using Mr. Eastwood's name in hidden metatags on the marketplace website, Defendants "figuratively posted a sign with Plaintiff's trademark in front of their online store to attract consumers to their products."  (Compl. ¶ 26; Dkt. 71-20 [Declaration of Eric Lowe, hereinafter "Lowe Decl."] ¶¶ 5–6.)

With respect to the third and fourth elements, Plaintiff alleges that neither Plaintiff nor Mr. Eastwood consented to such use.  (Eastwood Decl. ¶ 2; Bernstein Decl. ¶ 3.)  Finally, Plaintiff alleges that it has been damaged by Defendants' misuse of Mr. Eastwood's name because they were deprived of the economic value of such use.  *See Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1090 (9th Cir. 2002) ("[T]he measure of damages available for misappropriation claims includes the economic value of the use of an individual's name and likeness.").

### b.  California Civil Code Section 3344

Under Civil Code section 3344, Plaintiff must prove all of the elements of the common law right of publicity claim plus (1) a knowing use by the defendant, and (2) a direct connection between the use and the commercial purpose.  *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001).  Plaintiff successfully maintains that "Defendants' misuse of Mr. Eastwood's name in hidden fields on the marketplace website was no accident[.]"  (Mot. at 9.)  The Complaint asserts that "[a]t all times mentioned in this Complaint, all of the Defendants acted in concert to knowingly cause, facilitate, control, induce, or otherwise participate in the wrongful conduct alleged herein."  (Compl. ¶ 14.)  Plaintiff also states plainly that the use of the hidden metatags was to attract consumers to purchase CBD products from the Defendants.  (*Id*. ¶ 36.)  Plaintiff therefore successfully states a section 3344 claim.

### c.  False Endorsement Under the Lanham Act (15 U.S.C. § 1125(a)); Trademark Infringement (15 U.S.C. § 1114(1)(A), and Common law Trademark Infringement

The elements of claims for False Endorsement under the Lanham Act, Trademark Infringement under the Lanham Act, and common law trademark infringement are identical.  *See Einstein v. Baby Einstein Co. LLC*, 2009 WL 10670676, at * 4 (C.D. Cal.

Dec. 21, 2009); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012); *Grey v. Campbell Soup Co.*, 650 F. Supp. 1166, 1173 (C.D. Cal. 1986). Plaintiff must show that Defendants, without consent, used in commerce a reproduction, counterfeit, copy, or colorable imitation of Plaintiff's registered mark, in connection with distributing goods, and that such use is likely to cause confusion, or to cause mistake, or to deceive. *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988); 15 U.S.C. § 1114(1)(a).

Plaintiff has shown all elements of their trademark claims. First, Plaintiff owns all rights related to the Registered Mark in Mr. Eastwood's name and all common law trademark rights. (Eastwood Decl. ¶¶ 3–4; Bernstein Decl. ¶¶ 3–4.) Second, Plaintiff alleges that Defendants have used the mark in commerce to sell CBD products without Plaintiff's consent by using Mr. Eastwood's name in hidden metatags. (Compl. ¶ 5; Lowe Decl. ¶¶ 5–6.) Finally, Plaintiff alleges facts sufficient to show Defendants create, at least, "initial interest confusion" for consumers by using Mr. Eastwood's name in hidden metatags. *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1025 (9th Cir. 2004) ("Initial interest confusion is customer confusion that creates initial interest in a competitor's product."); *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1062 (9th Cir. 1999); (Compl. ¶ 26.) Indeed, Plaintiff alleges that consumers are initially confused about whether Mr. Eastwood has endorsed the CBD products at issue here because search results for Mr. Eastwood's name in connection with CBD products guides consumers to Defendants' CBD marketplace which offers for sale CBD products. (Compl. ¶ 26; Exhibits 1–2.) This is made plain by Plaintiff's allegations and supporting evidence that a search on Defendants' online marketplace for "CLINT EASTWOOD CBD PRODUCTS" produces results for 61 CBD items. (*Id.*) And even if the consumer realizes that Mr. Eastwood does not actually endorse CBD products, the harm has been done. "Once the consumer's attention is captured, the consumer might well realize that he or she has arrived at the defendant's (and not the plaintiff's website),

and yet might stay there and purchase the defendant's similar products." *Soilworks, LLC v. Midwest Indus. Supply, Inc.*, 575 F. Supp. 2d 1118, 1130 (D. Ariz. 2009) (internal quotes and citations omitted).  "Although a sale procured in this manner does not ultimately result from the consumer's confusion as to the source of the products, it is procured nonetheless through the defendant's unfair use of the plaintiff's trademark and associated goodwill." *Id.*  Plaintiff therefore successfully states its trademark claims.

### 4.  The Sum of Money at Stake

The fourth *Eitel* factor requires the Court to "consider the amount of money at stake in relation to the seriousness of [Defendant's] conduct." *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176.  "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 1012 (C.D. Cal. 2014).  Here, Plaintiff seeks a significant sum of money: $3 million "as the fair market value of Defendants' misuse of Mr. Eastwood's name in . . . hidden fields on the CBD marketplace website[.]"  Though the Court ultimately finds that $3 million is not supported by the evidence, the amount sought is not unreasonable in relation to Defendants' unlawful conduct of exploiting and misusing Plaintiff's rights for their own commercial gain.

Plaintiff is correct that the standard for measuring damages in a right of publicity case is the fair market value of the right to use plaintiff's name or likeness in the way the defendant used it.  *See Hoffman v. Capital Cities/ABC, Inc.*, 33 F. Supp. 2d 867, 875 (C.D. Cal. 1999) (holding that Dustin Hoffman was entitled to compensatory damages in an amount representing the fair market value of the right to use his name and likeness), *reversed on other grounds*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001); *White v. Samsung Elec.*, 971 F.2d 1395, 1399 (9th Cir. 1992) (similar).  But Plaintiff acknowledges that ascertaining the fair market value of lending Mr. Eastwood's

name to endorse CBD products is difficult because Mr. Eastwood has only agreed to one prior endorsement deal and Mr. Eastwood would have never lent his name to endorse CBD products.  (Mot. at 15.)

Nevertheless, Plaintiff presents evidence that $3 million is what Plaintiff would have charged for allowing Mr. Eastwood's name to be used in hidden metatags in association with CBD products.  (Mot. at 15–19.)  Specifically, Plaintiff points to (1) the license fee of Mr. Eastwood's one prior endorsement; (2) Howard Bernstein's declaration of the minimum amount Plaintiff would consider to license Mr. Eastwood's name to such products; (3) a comparison with the license fees obtained by actors of similar statures; (4) the amount recently awarded to Mr. Eastwood for the wrongful use of his name in a similar lawsuit for misappropriation, and (5) the analysis and declaration of a professor of marketing at the University of Southern California Marshall School of Business.  The Court takes each in turn.

### a)  Mr. Eastwood's Prior Endorsement Fee

Plaintiff represents that the only time it licensed Mr. Eastwood's name and likeness was for a special, Chrysler-sponsored, Super Bowl television commercial in 2012 entitled *Halftime in America*, which addressed the United States' resilience and recovery from the Great Recession.  According to Plaintiff, Mr. Eastwood felt strongly about the commercial and its message, accepting a fee "well below his market value" at $2 million.[2]  (Eastwood Decl. ¶ 5; Bernstein Decl. ¶¶ 5–8.)  By contrast, Plaintiff represents

---

[2] Plaintiff filed an application to seal the portions of Howard Bernstein's declaration which provide the amount Mr. Eastwood received for the Chrysler commercial *Halftime in America*.  (Dkt. 69.)  A party seeking to file documents under seal "bears the burden of overcoming [the] strong presumption" in favor of public access to court records.  *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016) (quotation omitted).  "The presumption of access is 'based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of

that Defendants used Mr. Eastwood's name "to lure consumers to a crass and cheap-looking CBD marketplace advertising unknown CBD products that Mr. Eastwood does not use and does not believe in." (Mot. at 16; Susman Decl. ¶¶ 2, 3, 7, Exhibits 1, 2, 5, 6; Eastwood Decl. ¶ 3; Bernstein Decl. ¶¶ 5–7.) Plaintiff maintains that Mr. Eastwood's fee would therefore be more than the $2 million he received for *Halftime in America*.

Though the Court agrees that a premium should be awarded to Mr. Eastwood given his own apparent repugnancy to endorsement deals and the CBD products at issue in this case, the Court cannot ignore the fundamental differences between a Super Bowl commercial and using a name in a hidden metatag. With a commercial, average consumers may happen upon it while watching a television program. With a hidden metatag, consumers must know or think to search for Mr. Eastwood in connection with CBD products to find Defendants' platforms and their products. The level of exposure provided to the endorsed products from a commercial compared to a hidden metatag is likely lightyears apart. Though *Halftime in America* may provide an appropriate benchmark for similar endorsement campaigns, it is an imperfect measure of damages in this case given the fundamental difference between the way Mr. Eastwood's name was used to endorse the products at issue here.

---

accountability and for the public to have confidence in the administration of justice." *Id.* (quotation omitted). "'[C]ompelling reasons' must be shown to seal judicial records attached to a dispositive motion." *Id.* at 1179. As a threshold issue, Plaintiff cites the incorrect standard, offering that good cause exists to seal this information rather than compelling reasons. *See Szabo v. Sw. Endocrinology Assocs. PLLC*, 2021 WL 3411084, at *1 (D. Ariz. July 27, 2021). ("A motion for default judgment—far from being a mundane procedural motion (such as a motion to extend a deadline)—is a case-dispositive motion which requires the Court to undertake an in-depth analysis.") At any rate, the Court disagrees that there is even good cause to seal this information. Contrary to Plaintiff's position, this information would not harm either Chrysler's or Mr. Eastwood's competitive standing. Plaintiff has offered as part of its damages evidence information containing the amounts other celebrities, whom according to Plaintiff are of similar stature to Mr. Eastwood, received for endorsement deals. (Susman Decl. ¶ 9, Exs. 8–11.) This is especially true considering Plaintiff has explicitly maintained throughout its motion and supporting evidence that the fee Mr. Eastwood received for *Halftime in America* was less than the fair market value of Mr. Eastwood's services for the commercial. (*See, e.g.*, Mot. at 16; Berstein Decl. ¶¶ 6–7.) These facts together strongly indicate that the risk to Mr. Eastwood's or Chrysler's competitive standing is minimal.

### b) Plaintiff's Declaration of the Minimum Amount it Would Require for A License

Howard Bernstein, Plaintiff's manager and business advisor to Mr. Eastwood for more than 50 years, also offers a declaration in which he states that Plaintiff would theoretically charge, at minimum, $3 million for Mr. Eastwood's name to be used to attract consumers to CBD products.  (Bernstein Decl. ¶¶ 3–7.)  Mr. Bernstein arrived at the figure by estimating that using Mr. Eastwood's name in hidden field would start at more than $2 million for a reputable, high-profile product that one might associate with Mr. Eastwood and then added a premium to this amount because the use of Mr. Eastwood's name for less reputable products would rely more heavily on Mr. Eastwood's goodwill than an established brand.  (Bernstein Decl. ¶¶ 3–7.)

Again, the Court understands Mr. Eastwood's own reluctance to endorse CBD products but questions the fundamental differences between a hidden metatag campaign compared to endorsement featured in print, on television, or on social media where a consumer need not actively look for the endorsement.

### c) License Fees Obtained by Actors of Similar Stature to Mr. Eastwood

Plaintiff also offers information regarding numerous celebrity endorsement deals to show that Mr. Eastwood's request is reasonable when compared with what other actors of similar stature charge.  For example, Selena Gomez signed a $10 million endorsement deal with Coach in 2016.  (Susman Decl. ¶ 9, Exhibits 8–11.)  Brad Pitt received $3 million to appear in Cadillac commercials in 2013 that only aired in China.  (*Id.*)  In 2011, Angelina Jolie endorsed Louis Vuitton for $10 million.  (*Id.*)

The Court is not persuaded by these figures.  As a threshold issue, the source of these figures appears to be nothing more than news articles rather than first-hand knowledge of the amounts paid to these other actors.  (*See id*.)  Second, these endorsement deals likely involve differing levels of involvement from the actor.  For example, Selena Gomez may be expected to appear in photo campaigns or commercials for Coach, whereas Mr. Eastwood is only lending his name here to a *hidden* metatag.  Without more information about these campaigns, it is difficult to use the deals of other actors, concerning non-metatag campaigns, with other brands, to truly assess the fair market value of Defendants' use of Mr. Eastwood's name here.  The Court therefore assigns this evidence little weight.

### d)  Mr. Eastwood's Other Legal Action

In 2020, Mr. Eastwood and Plaintiff commenced an action against other defendants that impermissibly used Mr. Eastwood's name and likeness in a series of fraudulent news articles that made it appear Mr. Eastwood was endorsing certain CBD products.  *See Eastwood, et al. v. Mediatonas UAB,* No. 2:20-cv-06503-RGK-JDE (C.D. Cal. Oct. 1, 2021) (hereinafter "Previous CDCA Action").  On October 1, 2021, the court in the Previous CDCA Action granted Mr. Eastwood and Garrapata's motion for default judgment, and awarded them $6 million in damages.  (*Id.*)  In arriving at the figure, the Court considered the license fee Mr. Eastwood received for *Halftime in America*, Plaintiff's declaration regarding a potential license fee, comparable license fees, and the expert license fee estimate of Joseph C. Nunes.  (*Id.*).  The Court concluded that Plaintiffs' $6 million estimate of Mr. Eastwood's fair market value for using his name in news articles was reasonable.

However, the facts and circumstances surrounding the Previous CDCA Action are distinguishable from the facts of this action.  Mr. Eastwood is not being portrayed in

fraudulent news articles but in hidden metatags.  Again, a consumer may happen upon a news article but must think to search for Mr. Eastwood's name in connection to CBD products to find Defendants' products here.  Given Mr. Eastwood's self-proclaimed reluctance to do endorsement deals, let alone endorse CBD products, the Court seriously questions the number of individuals that would think to search for Mr. Eastwood's name and CBD products in the first place.  Therefore, the Previous CDCA Action, while informative, is not directly on-point.

### e)  Expert License Fee Estimate

Plaintiff also offers a declaration from Joseph C. Nunes, who holds the Joseph A. DeBell Endowed Professorship in Business Administration and is a Professor of Marketing at USC's Marshall School of Business.  (Dkt. 74-18 [Declaration of Joseph Nunes, hereinafter "Nunes Decl."].)  Plaintiff offers that through his research and consulting experience, Mr. Nunes is familiar with the sums received by celebrities for numerous endorsement deals and the criteria that go into determining those fees.  (*Id*.)  Mr. Nunes has reviewed the evidence that is part of this Motion and has determined that the fair market value of Defendants' misuse of Mr. Eastwood's name and likeness easily exceeds \$3 million.  (*Id*.)  Mr. Nunes arrived at this sum based upon several factors, including: (1) Mr. Eastwood's stature in the motion picture industry; (2) Mr. Eastwood's limited experience in endorsing products; (3) the intent by Defendants to use Mr. Eastwood's name in hidden online fields to lure consumers to a CBD marketplace; (4) the reputation of the CBD products advertised by Defendants; (5) the purpose behind *Halftime in America*, and the inconsistency of CBD products with Mr. Eastwood's reputation.  (*Id*. ¶¶1–8.)

Mr. Nunes' declaration is helpful to the Court in assessing Mr. Eastwood's stature in the Hollywood industry, the fees involved in endorsement deals, and the inconsistency

of CBD products with Mr. Eastwood's reputation.  However, there is little in Mr. Nunes'
declaration regarding the actual exposure Defendants would hope to gain from the use of
Mr. Eastwood's name, which undoubtedly would impact the fair market value of its use.
Thus, Mr. Nunes' declaration leaves open the questions the Court has previously raised
about the specific type of endorsement at issue here.

### f)  Evaluating the Evidence

Considering the evidence presented, the Court finds that $2 million is a reasonable
estimate of the fair market value of the use of Mr. Eastwood's name in hidden metatags
and is supported by the evidence.  The one and only endorsement deal Mr. Eastwood
accepted was a $2 million fee for his work in a Super Bowl commercial, which he
maintains was far below his fair market value.  Though the Court accepts that this fee
was likely below the fair market value of Mr. Eastwood's services, it cannot ignore the
fundamental differences between a Super Bowl commercial campaign and the use of Mr.
Eastwood's name in a hidden metatag.  Without evidence concerning the exposure gained
from the hidden metatag or estimations of other similar campaigns, the Court believes
that *Halftime in America*, though useful, is not on all-fours with this case.  However,
there is no denying Mr. Eastwood's massive celebrity status nor his clear reluctance to
engage in endorsement deals, especially those concerning CBD products.  Accordingly, a
$2 million figure appropriately compensates Plaintiff for the premium that would be
necessarily required to induce it to agree to such a deal.  In other words, $2 million is a
reasonable representation of the fair market value of Mr. Eastwood's services in lending
his influential and known name to a hidden metatag campaign for products he likely
would have been unwilling to endorse in the first place.

### 5. & 6.  The Possibility of a Dispute Concerning Material Facts and Whether the Default was Due to Excusable Neglect

The fifth and sixth *Eitel* factors require the Court to determine whether it is likely that there would be a dispute as to material facts and whether Defendant's failure to litigate is due to excusable neglect.  Where a plaintiff's complaint is well-pleaded and the defendant makes no effort to properly respond, the likelihood of disputed facts is low. *See Landstar Ranger, Inc. v. Parth Enters., Inc.*, 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010).  There is no indication here that Defendants' default was due to excusable neglect because they failed to appear altogether despite being served with the Complaint.  *See Adobe Sys. Inc. v. Kern*, 2009 WL 5218005, at *6 (N.D. Cal. Nov. 24, 2009) ("Defendant's voluntary decision to allow default to be entered contradicts any argument for excusable neglect.").  Given that Plaintiff's factual allegations are taken as true, and that Defendants have failed to oppose Plaintiff's motion, the Court is not aware of any factual disputes that would preclude the entry of default judgment.  Accordingly, both of these *Eitel* factors weigh in favor of granting default judgment.

### 7.  The Public Policy Favoring Decisions on the Merits

Because public policy favors resolution of cases on the merits, this factor always weighs against granting a motion for default judgment.  "The mere enactment of Rule 55(b), however, indicates that 'this preference, standing alone, is not dispositive.'" *Prinko Image Co.*, 2018 WL 6264988, at *3 (quoting *PepsiCo*, 238 F. Supp. 2d at 1177). Indeed, Defendants' choice not to defend themselves renders a decision on the merits against them "impractical, if not impossible."  *PepsiCo*, 238 F. Supp. 2d at 1177. Because no other factor weighs against default judgment, the policy favoring resolution on the merits does not prevent the Court from granting default judgment in this case.

For the foregoing reasons, the Court finds that the *Eitel* factors favor granting Plaintiff's motion for default judgment against Defendants on all claims.

### E.   Relief Sought

Once a court concludes that default judgment is appropriate, it must determine what relief is warranted.  A plaintiff carries the burden of proving his requests for relief. *See Bd. of Trs. of the Boilermaker Vacation Tr. v. Skelly, Inc.*, 389 F. Supp. 2d 1222, 1226 (N.D. Cal. 2005).  Here, Plaintiff seeks (1) a permanent injunction; (2) monetary damages; (3) and attorney fees and costs.  (Mot. at 14–25.)

### 1.   Permanent Injunction

Pursuant to 15 U.S.C. § 1116(a), the Court has the power to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark."  15 U.S.C. § 1116(a).  A plaintiff seeking a permanent injunction must demonstrate: (1) irreparable injury, (2) lack of other adequate remedies; (3) a balance of the hardships that tips in its favor; and (4) no negative impact on the public interest due to the permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Here, Plaintiff has shown actual success on the merits.  Defendants have impermissibly used Mr. Eastwood's name to promote and sell CBD products without Plaintiff's consent in violation of Plaintiff's rights of publicity.  Moreover, Defendants have infringed upon Plaintiff's trademarks in Mr. Eastwood's name, creating a likelihood of confusion and thus establishing irreparable harm. *Phillip Morris USA Inc. v. Shalabi*, 352 F. Supp. 2d 1067, 1074 (C.D. Cal. 2004) ("Irreparable harm to reputation and goodwill is presumed as a matter of law where, as here, the plaintiff has demonstrated a

likelihood of confusion arising from the infringement."); *Sony Computer Entertainment America Inc. v. GameMasters*, 87 F. Supp. 2d 976, 984, 54 U.S.P.Q.2d (BNA) 1401, 1407 (N.D. Cal. 1999) ("once plaintiff establishes a likelihood of confusion, 'it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief does not issue'") (quoting *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1220 (9th Cir. 1987)).

Deeming the allegations as true, Mr. Eastwood also does not want to be associated with CBD products and any indication that he is damages his reputation.  Without a response from Defendants, there is not enough information before the Court to determine what hardship Defendants would suffer if the injunction is granted.  However, the harm to Plaintiff is clear and thus the balance of hardships tips toward Plaintiff.

Finally, there is no indication that a permanent injunction would not be in the public's interest.  Indeed, the public has an interest is not being confused or misled by fraudulent celebrity endorsements.  *See Century Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1181 (9th Cir. 1988).  Thus, Plaintiff has demonstrated it is entitled to permanent injunctive relief against Defendants.

Accordingly, Defendants and their officers, agents, employees, representatives, and all persons acting in concert or participating with them, are permanently restrained and enjoined from (1) engaging in or performing directly or indirectly the use of Clint Eastwood's name, likeness, and personal to promote and sell any products, and (2) using any names, words, designations or symbols consisting of, incorporating in whole or part, or otherwise similar to Clint or Eastwood or any other common law trademark owned by Plaintiff or Mr. Eastwood in any buried code, hidden field, metatags, search terms, keywords, key terms, hits generating pages, or any other devices used, intended, or likely to cause any web site or web sites listed by any Internet search engines in response to any

searches that include any terms identical with or confusingly similar to the Clint
Eastwood mark.

### 2.  Monetary Damages

As explained above, the Court finds that $2 million in monetary damages
represents the fair market value of the right to use Mr. Eastwood's name in the like and
manner in which Defendants used it.  *See Hoffman*, 33 F. Supp. 2d at 875.

### 3.  Attorney Fees and Costs

Plaintiff also seeks attorneys' fees and costs pursuant to California Civil Code
section 3344 and the Lanham Act.  Civil Code sections 3344(a) and 3344.1(a)(1) provide
that "[t]he prevailing party in any action under this section shall also be entitled to
attorney's fees and costs."  "The mandatory fee provision of section 3344, subdivision (a)
leaves no room for ambiguity."  *Kirby v. Sega of Am., Inc.*, 144 Cal. App. 4th 47, 62
(2006).  When a party properly requests attorneys' fees in default actions, "the court is
obliged to calculate a 'reasonable' fee in the usual manner," *i.e.*, the lodestar method."
*Vogel v. Harbor Plaza Ctr., LLC*, 893 F.3d 1152, 1159 (9th Cir. 2018).

"The lodestar is calculated by multiplying the number of hours the prevailing
party reasonably expended on the litigation by a reasonable hourly rate."  *Ferland v.
Conrad Credit Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001).  The party seeking fees
bears the burden of documenting the hours expended in the litigation and must submit
evidence supporting the hours and rates claimed.  *Hensley v. Eckerhart*, 461 U.S. 424,
433 (1983).  Although "a court must specifically explain the reasons for a reduction of
the requested fees by more than 10%, such explanation need not be elaborate so long as it
is clear."  *Klein v. Law Offices of D. Scott Carruthers*, 2015 WL 3626946, at *5 (N.D.

Cal. June 10, 2015) (citing *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111–12 (9th Cir. 2008)).  "[T]he district court has a great deal of discretion in determining the reasonableness of the fee." *Camacho*, 523 F.3d at 978.

The Court lacks adequate information at this time to support an award of attorneys' fees and costs.  In reviewing the bills Plaintiff submitted to the Court, it is unclear if Plaintiff is seeking an award of attorneys' fees incurred in litigating this case against the other former Defendants who Plaintiff voluntarily dismissed earlier in this action.  (*See* Dkt. 43 [Plaintiff's Notice of Dismissal With Prejudice of Defendant BizX Marketing, LLC]; Dkt. 64 [Plaintiff's Notice of Dismissal With Prejudice of Defendants AZ Connections, LLC and Jeff Taylor]; Dkt. 68 [Plaintiff's Notice of Dismissal Without Prejudice of Defendants Colin Andrews and Thundercom Systems Ltd.].)  The Court is also unclear as to whether Plaintiff settled with these former Defendants or why the remaining Defendants would be responsible for the entirety of Plaintiff's legal bills and costs in prosecuting an action against other defendants, especially when some have been dismissed with prejudice.  *See Kenner v. Bitterroot Timber Frames, LLC*, 2022 WL 1265839, at *5 (D. Mont. Apr. 27, 2022) ("[C]ourts often condition dismissal without prejudice on a plaintiff's payment of the defendant's attorneys fees and costs[.]"); (Dkts. 43, 64.)  Therefore, the Court denies Plaintiff's request for attorneys' fees and costs without prejudice.

//
//
//
//
///
///
//

**III.   CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for default judgment is **GRANTED IN SUBSTANTIAL PART**.  Plaintiff is awarded $2,000,000 in damages and the requested injunctive relief.  Plaintiff may bring a renewed motion for attorneys' fees and costs in connection with this default judgment no later than **May 25, 2022**.  The Court will enter judgment against Defendants and in favor of Plaintiff.

DATED:     May 13, 2022

_____

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

CC: FISCAL